Thank you, Your Honor. May it please the Court, my name is Warren Postman, I represent Appellate Lance Wood, and I'd like to try to recur for two minutes at a time. By excluding Mr. Wood from services at the Pierson Chapel, Appellate is imposed a complete bar on one form of Mr. Wood's religious practice. But the District Court never analyzed that burden under shared scrutiny as required by the court, because it concluded that Wood had no remedy. Wood had no claim for injunctive relief, because after more than six months of excluding Wood from the chapel, Appellate has lifted that burden so that the injunctive claim is removed. But the District Court also concluded that Wood had no damages claim because Appellate did not receive any federal funds for evidence. Not in every loop it didn't cover that. It didn't give Wood a damages claim in those circumstances. That conclusion was wrong in both statutory and the constitutional matter. As a statutory matter, I think there's two key provisions of the loop that have been crystal clear. There's a damages claim in these circumstances. Well, just a moment. You say it's wrong as a statutory matter and a constitutional matter, but it's not wrong as a factual matter, is it? It is true that these defendants did not receive any federal funds. That's right, Your Honor. And do we know whether the prison received any federal funds? On this record? Well, on this record, I think the court would have to take judicial notice of the materials we cited in our reply brief and a footnote. It was not really litigated in the District Court in part because Appellate, to my understanding, never claimed that the loop didn't apply. The loop only applied to where the program received federal funds. And they could have said, the loop doesn't apply to all of the states because we don't receive federal funds. My understanding is that every state receives federal funds for prisons, and that it's difficult to just take judicial notice of that. So the statutory question I was referring to was, if a prison takes funds but the individual officers do not themselves get it, can a plaintiff whose rights are violated under the loop sue the officers in an individual capacity for damages? And I think there's two key provisions in RUPA that make clear that it's a statutory matter where RUPA was intended to cover. Well, but really, aren't you asking us to find differently than our sister circuits found? I am, Your Honor. And frankly, the 10th Circuit reviewed all the circuits' analysis and went through them. And then after going through them, they said, there can be no damages here. That's right, Your Honor. And not only did the 10th Circuit do it, but they reviewed all the other circuits' analysis and determined that they didn't want a part from it. Right. I'm happy to explain how, if you would ask me, I think those circuits took a wrong turn. I understand. That is your job. So it was, I believe, the 11th Circuit first in 2007, and then the next two cases came really quickly. They cited the 11th Circuit without much more analysis, and it was off to the races. But I think they did take a wrong turn. And if I could, I'd start with the statutory matters. You don't want us to get out there on our own as we normally do, do you? Only when you're right. What do you think we're all for, Brooke? We don't. We aren't the ultimate decider of that question. But I think the key language to focus on in the statute is the definition of government first, where after saying that government includes any state, county, department, et cetera, and any officers, which I think means officers in their official capacity, I think, it then says government also includes, quote, any other person acting under a state law. And then you create a clause of action where it says that a plaintiff has a clause of action for, quote, appropriate relief. Now, does this court make clear in the city of Yuma where a federal statute creates a right to appropriate relief and there's no defending the sovereign immunity, the presumption is that appropriate relief includes damages. In fact, that's the first sort of relief you can get, and junk relief is extraordinary. And so I think the city of Yuma makes that very clear. The other key point is that- Well, but the city of Yuma, really, there wasn't any sovereign immunity issue there, was there? No, there wasn't. Municipalities don't get sovereign immunity. So really, the city of Yuma is not directly on point. To the contrary, Your Honor, there's no sovereign immunity for appellees either. So I think the city of Yuma is analogous to appellees here, whereas, in contrast, in Sassemont, when the Supreme Court said there were no damages, that there is a sovereign immunity question here, right? I don't believe so, Your Honor. Appellees are not entitled to sovereign immunity as individuals. Oh, as an individual. Yeah, and that's the distinction that I was going to with the second point, which is, if the phrase, any other person acting under a colored state law didn't give plaintiffs a right to damages, they would do nothing, essentially. Because a plaintiff can only sue an officer in their official capacity for injunction. That's covered by suing the definition of officer under government. But you'd agree that the individuals are not party to the contracts between the federal and local governments? That's correct, Your Honor. And I think that goes, at most, to the constitutional permissibility of subjecting them to liability. And this can be analyzed in slightly different ways. But I think that, for me, the simplest way to ask is, if you read the statute by itself, that Congress wants to apply a damages revenue here, and then you can go to the next question of, OK, if it did that and subjected someone who didn't get federal funds to get damages, is that within the Congress's power under the spending clause? Now, on the first question, I think, in addition to city of Sassemont, which does appropriately include damages, it's very compelling that the phrase, any other person acting under a color of state law, would not give a plaintiff anything if it didn't give them the right damages, because they can already get injunction relief against an officer. So on the spending clause purpose issue, I would just note that the district court appeared to think that, as you alluded to, Judge Smith, if a defendant hadn't received federal funds, it was beyond the reach of the spending clause. Well, I don't think the district court was way out at lunch. That's what I was trying to emphasize. There's been no other circuit examined like this who's gone where you want them to go. That's right, Your Honor. The district court pointed to all that circuit authority from other circuits. But I think the reason they're wrong is disobedient. And the U.S. Supreme Court said very clearly that Congress can not only subject a defendant to damages, but criminal penalties when they receive no federal funds. And the reason for that is that all the cases the other circuits cited about the spending clause being limited to the nature of a contract, those were cases where the defendant was a state and had sovereign immunity. And the argument was that they were directly liable for the spending clause. But Congress is not limited to regulating under the spending clause. It also has the necessity and profit clause, and the two work together. The court made this very explicit in Southerby. It's at page 605 of their opinion. It explains how there's the two forms of regulation. And so it could regulate someone who wasn't a third party. And the last one I would note is that if Congress can not regulate third parties in this way, then there's a major hole in the purpose of the rulebook. The rulebook was intended to prevent a certain- It was intended to prevent it. I don't think there's a big hole in the rulebook. They're the ones who are supposed to fill it. We just read it. Congress didn't make it the way it ought to be. They need to go back and do something about it. Not that they do do that and compromise on a daily basis. I agree, Your Honor. I only came in because I just made one point, which is the analysis of whether it's permissible under the necessary and proper clause turns on whether it's appropriate for Congress to effectuate the purposes of the spending. And if Congress is left powerless to stop the recipients of federal funds from discriminating against people on the basis of their religious practice, then it is relevant- You don't question that Congress could have provided a remedy if they- Well, and that's why I split it into statutory and constitutional terms. I think not only could they have, they clearly did in the rulebook. And my point then is that, yes, they do have the power under the Constitution to do that. Let me ask you a slightly different question, and I'll give you some time for thought. The district court did undertake an analysis under the free exercise clause. How do you view that analysis as being different from the analysis that would have been required for the district court under the rulebook? It is quite different, Your Honor. Under the free exercise clause, under Employment Abilities, any mutually applicable rule is immune to challenge on the basis of free exercise. Yes, no, I understand that. I guess my question, and I wasn't proud or clear, the district court really made some pretty specific findings in terms of reaching the free exercise clause. And some of those findings, factually, as far as talking about the legitimate purpose, overlap with some of the findings that may be necessary under the rulebook. So my question to you, and I think I know what your answer is, is there any way on this record to reach the merits of the rulebook claim based on the district court's finding on the free exercise clause? I understand the question, Your Honor. No, there's no way to reach the merits, and there's a couple of reasons. One, although the district court opinion is not crystal clear, I read it as applying the Barnett v. St. Tony standard to the First Amendment claim, which means that when he said there wasn't enough evidence, it wasn't the right standard. He wasn't saying there's enough evidence to conclude that they needlessly burdened the religious exercise. What he was saying was, well, there wasn't enough evidence to prove there was no basis, objectively, that some other officials couldn't have also burdened the religious exercise. But beyond that, the rulebook does not just require a showing that they did it for a religious reason. It requires a showing that that reason is compelling. And the court in Solano County Jail, I think, made very clear that you can't just point to general interest in security. You have to show what would have happened had they let him attend group religious services. What really would have happened? Well, in this case, the district court found that, in fact, there was disruption that was going to occur. He was displacing other people from their religious exercise, allegedly. Well, that was only the third memo, I believe. But even with regard to that, I think that against Solano County, which I think has a great discussion about what this makes good, you can't just say that. You have to actually prove it. And there was certainly reason. And this was summary judgment, of course, and they need to construe everything in favor of the plaintiff. There was plenty of evidence to the contrary. There were 10 affidavits from nurses and guards saying there was a number of problems. And then the final point is they also have to show these restricted meetings, which doesn't come into the retaliation analysis. They have to show that they couldn't have, for example, just had a superviolence where people attended religious services or put restrictions on the chapel of Peterson. And they never went through that analysis. I think it's too fat bound and too disnutting to do at this stage. Thank you again. Our questions are taking over time, but we'll give you two minutes for any questions. Thank you for your support. My name is Mike Relaya, and with me is Brady Malico, counsel who represents the Idaho Department of Corrections, defendants in this case.  This case began in 2003 with incidents that involved Mr. Wood and an uncoordinated relationship with correctional officers and morphine. In 2004, Mr. Wood filed a lawsuit involving that case, and that case was pending when this lawsuit was filed in 2007 on retaliation against the Idaho Department of Defendants. The Idaho Department of Corrections defendants were announced in 2013, and the clock continues to tick, but we're here to try and resolve this case and get some final resolution. This is quite a powerful plaintiff in this case. And what, could you straighten me out as to what institution he was in when the episode that gave rise to the first lawsuit took place and then when he was chained, when he was moved? Sure, Judge. Mr. Wood was housed at the orthodontic facility in the period including 2003. That's just 40 miles down the road from here. During that time period, he allegedly had an untoward relationship with correctional officers, and when that was discovered, he was moved to the facility in Boise, ISCI there. So the rest of the events in this case occurred while he was housed at ISCI. So he filed the first suit when he was at ISCI? He did, yes. The facts that have led to the allegations made in this case are essentially conduct by Department of Corrections employees who are trying to determine, A, what happened with their own employees, and now I'm talking about Chaplain Les Peterson, and why Mr. Peterson decided to try and contact one of these ladies on behalf of Mr. Wood. Allegedly without Mr. Wood's knowledge. We don't know that one way or another. And then a year later, there were allegations and concerns about Mr. Wood's conduct in the religion facility in the chapel itself. And that event, those events led to the restriction on religion as led by a plaintiff. What's important, in our view of the case, is that Mr. Wood was never restricted from his practice of religion. Not a single time. And it was cited over and over again, it was banned, but the facts don't support any of that. Well, that's kind of why I asked your colleagues on the other side of the question. Can we reach that issue on this record? The district court didn't reach the merits of an illegal claim. It did reach the merits of the free exercise claim. The claim didn't pass, but there's a different analysis under illegalism. Explain to me why you think that we, rather than the district court, can resolve that kind of merits. Judge, I believe you can, based on the record. I think the record is very well-developed, with affidavits filed by both sides, well-discussed by the district court under the First Amendment analysis. Why I think the court, this court, can decide under RLUIPA, if we get there, if it is applicable, is that the first issue on RLUIPA is whether there's substantial burden to his practice of religion. And I think this court has previously decided that, in looking at cases, in preparation for coming here today. In the Hartman v. California case, cited 707 F. 3rd 1114, where the individual had a practice involving a Wiccan belief, and his claim was that there was no Wiccan chaplain. There were other chaplains of other denominations, but no Wiccan chaplain. There was a volunteer chaplain. They come once a month. There was also chaplains of other denominations. And he claimed in his plea that his practice had been limited. The court, looking at Warshel under 12b. 6 motion, said, you can't even state a claim. Your practice has not been so changed that you cannot practice your Wiccan beliefs. It's been limited. Do you think the facts are undisputed on that point? On the first point. In this case, they are absolutely undisputed. So your argument would be there may be disputed facts on whether or not the punishment was appropriate, what happened, whether Wood should have been excluded at all, but there are no facts undisputed, as to the burden placed on him. Yes, Your Honor. So you would agree that if, in fact, he were prohibited from practice, from going to any services for six months, that that would be a burden? If that were in fact the case, I think it would be a burden. If that were central to his practice of his religion. But your position is that he wasn't barred from services. He was not. And in fact, the two times he was limited, it was in coordination with Mr. Wood to set specific times and guards, any and necessarily the correctional officers who were there at the facility, would know that he could be there, despite the fact that there was a concern about him being around the chapel area and around in the work. If he was banned from his work for a period of time, that is also undisputed, but there's no constitutional right to that. Go ahead. Do you have an answer to counsel's suggestion that central, familiar, Cristiano Buenos Nieves, I'm from Idaho, so I don't say it right, versus you, Mother, is controlling in this matter? I'm glad you took a shot at my pronunciation. Our answer is truthful. Number one, that in the city of human case, what I'll call it, the court can just conflict with your own education. That's true. I don't think that's any better. The court didn't have the issue of reluca, the applicability of reluca, and whether it applied to the municipality before it. It just wasn't, at least in the opinion, and as far as I can tell, in the briefing. The second answer to that is that a municipality is different than a state entity. There is no sovereign immunity to it. But doesn't that cut against you in this case? I think it could cut against Judge, although I would put the state actors in a different category. And I know 1983 allows that individual action against state actors, but under reluca, we're getting on with the spending clause there and the authority for that. And so in order for those state actors to be subject to the provision of reluca, that higher scrutiny, they need to be able to accept the contract with the federal government. They've never had that opportunity. So there's a little blending of it. But it seems kind of like Yuma, the city of Yuma and the state actors are similar. I mean, it seems like that if you read Yuma and you really read what it says, that there's not much difference between the city of Yuma and the state actors. We're not talking about the state itself. We're not talking about somebody who took the contract funds, which Yuma had not done. So I'm wondering, I mean, when I read Yuma, I said, I was wondering what you were going to say when he said he was controlling the case. The fact of the first answer, which is it wasn't an issue in the case, as far as I can tell. But I think there is a good rationale for treating the municipality differently. I don't know if the record supported the municipality had received federal funds or whether that was, again, an issue in the case. But there is no dispute on this record that Deputy Warden Yorty, McEachern, Nelson, those individuals did not. Well, why after Savory or Savory did they not pronounce it? Does that make any difference? I mean, the Supreme Court changed a little bit of the spending clause of jurisprudence in that, I think, by widening it, saying you really don't need that level of proof. Ms. Thomas, under Savory, as we've read that case, the Congress passed legislation under a necessary improper clause to enforce the provisions of making sure that federal funds don't get squirreled away in bribe attacks. And so they passed a criminal law to ensure that that's not going to happen. And there are different authorities. So the fact that the individual in Savory was subject to that legislation, in our view, doesn't make an instant connection back to the spending clause. The spending clause is part of the case, to be fair to that. Yes, absolutely. And Justice Souter discussed the spending clause and, I think, took a little bit different tact than the other circuits prior to that case that are considered due for loop effect. So, I mean, to me, Savory changed that. Now, the Third Circuit case is after Savory, but everybody else's, all the other cases from the circuits are before that case. So as I see my time is up, I would just conclude by asking the Court to follow the six other different circuits that have been analyzed in this case throughout the progression of the Supreme Court's views on RLUIPA and its limitations and its efforts to maintain its constitutionality by limiting its use and not imposing monetary damages against the individual defendants. Thank you. Any other questions? Thank you, counsel. Thank you. And we'll give you two minutes for questions. Thank you, Your Honor. If I could just make a couple quick points about the substantial burden issue. I think bringing these Solano County Jails speaks very specifically to the way the analysis should go. As I understand my appellee's argument, the appellee's argument in that brief, their argument that because, or if, would, could have practiced religion in some other way, it's not a substantial burden if it was limited to a couple days a week. Solano County Jail rejects that. If that's a case where the plaintiff was prevented from improving religious practice and the defendant said he could still practice his religion in another way, the court said, no, that's too broad. Religious practice, you look to the burden on the facet of religious practice. Now, substantial burden, and Ward-Solder discussed this, that comes up where rather than banning a religious practice, the prison burdens it. In Ward-Solder, the prison said, well, you can leave your patient care, but you're going to be subject to other restrictive conditions. And the question is, do those conditions burden him substantially enough? But the way you're banning him. Well, partially banned. I'm sorry? Partially banned. But I mean, well, certainly the last amendment, on its face, bans him from any group of religious practice which is directly in line with Solano County Jail. Would you agree, let me interrupt you for just a second. Would you agree that the facts are undisputed as to this prong of the argument, in other words, what burdens were placed on him? Not exactly, as I heard my opposing counsel describe it. I do believe it's undisputed, but it was paved. I think it's undisputed that for the first week, he was not allowed to perform at all. Now, appellees say that that was a misunderstanding. He makes it different. And there's some evidence to suggest that it wasn't a misunderstanding. I would note that if it were really a misunderstanding, it would have been very easy in the second amendment to say, oh, no, religious practice is fine. It's not what the second amendment said. It says you can go for two hours each week and everything else is excluded. Yeah, I guess my take on it was that there was a lot of, there were factual disputes about the justification and a lot of other material in the record. But there wasn't much, there's not much dispute as to what actually happened in terms of the restrictions he was placed under. Do you agree with that? I think that's right. I'm just a little hesitant because it might have been a different view, but I think it's clear that he was banned for a week, limited for the next memo, and then banned from all group practice for the last week. And then the last memo, when you say the last memo, you're talking to one from Ludlow or Esther Ludlow? I believe it was a little bit February 1st, 2007. I'm just trying to make sure that I'm following you with the second memo and last memo so that I got them down here. Because my list is not second to last, but I think that I'm past the date. As I understand it, this report described it as February 1st memo from the ER 14. I just wanted to make sure I had your opinion. Thank you. Thank you for your argument. The case is here to be submitted for decision. Well presented. There was a briefing in the argument today. I appreciate you coming out from D.C. Were you participating under a bonus program? Yes. Thank you very much. We appreciate it. We express our appreciation for that. Thank you. The case is here to be submitted. And we'll wait for Dixon to come forward. And students in legal aid will be transferred.
judges: Schroeder, Thomas, Smith